IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

BRENDA SAPIR, LORI )
WEAKLAND, JO ANN BRUNS, )
On Behalf Of Themselves )
And All Others Similarly )
Situated, )
)
       Plaintiffs, )
)
)
)
vs. )
)
)
)
DELPHI VENTURES, )
DELPHI BIOINVESTMENTS )
III, L.P., )
DELPHI VENTURES III, )
L.P., OAK INVESTMENT )
PARTNERS VI, L.P., )
OAK VI AFFILIATES FUND,L.P., )
DONALD J. LOTHROP, )
ANN H. LAMONT, NARESH )
NAGPAL, M.D., DAVID H. )
FATER, HAMBRECHT & QUIST )
LLC, RAYMOND JAMES & )
ASSOCIATES, INC., VOLPE )
BROWN WHELAN & )
COMPANY, LLC, AND )
ERNST & YOUNG LLP, )
)
       Defendants. )

**99 - 8086
CIV-ZLOCH**

CIVIL ACTION NO. _____ **MAGISTRATE JUDGE
SELTZER**

CLASS ACTION COMPLAINT

<u>JURY TRIAL DEMANDED</u>



## INTRODUCTION

Plaintiffs sue Defendants and allege:

1.    This is a securities class action brought on behalf of all persons, other than the defendants and their affiliates, who purchased or otherwise acquired at any time prior to December 17, 1998, the common stock of BMJ Medical Management, Inc. ("BMJ" or the "Company") pursuant or traceable to BMJ's February 4, 1998 initial public offering and who were damaged thereby (the "Class").

2.    Each of the defendants participated in, approved, and/or permitted to be made misrepresentations of material fact, and omitted to disclose material facts necessary to make the statements made to plaintiffs and the Class not misleading, concerning BMJ's capitalization, accounting practices and management procedures in violation of the federal securities laws. Each defendant did not believe, and/or had no reasonable grounds to believe, that the statements made to plaintiffs and the Class were truthful and complete.  As a result of defendants' wrongful conduct, plaintiffs and the members of the Class have been damaged.

3.    BMJ initiated the public trading of its common stock (the initial public offering, or "IPO") pursuant to a Registration Statement filed with the U.S. Securities and Exchange Commission ("SEC") that became effective on or about February 4, 1998, and a final Prospectus of the same date contained therein (collectively, the "Prospectus").  By virtue of the IPO, and giving effect to the over-allotment option exercised by the underwriters as alleged herein, BMJ issued an aggregate of 4,600,000 shares of common stock at $7.00 per share.  As a result, BMJ raised total proceeds, before underwriting discounts and related fees, of $32,200,000.

4.    In the Prospectus, defendants directly or indirectly participated in falsely portraying BMJ's financial condition and business prospects.  For example, the Prospectus noted that BMJ strived to be "the leading musculoskeletal network in each of its markets by aligning the Company's interests with those of the Practices' physicians."

5.    At the time of the IPO, however, defendants knew, or in the exercise of reasonable diligence should have known, that this statement was materially misleading.  In fact, defendants

knew or should have known that BMJ's mounting indebtedness, misleading accounting practices, management inadequacies and chronic undercapitalization precluded BMJ from forming "the leading musculoskeletal network in each of its markets".  In fact, defendants knew or should have known at the time of the IPO that BMJ's actual financial and business practices, while omitted from disclosure in the Prospectus, doomed the Company to failure.

6.    Despite disclosing in boilerplate certain risks in connection with its business operations, the true circumstances of BMJ's affairs were misrepresented and omitted from the Prospectus, and concealed from the plaintiffs and the members of the Class.  For example, the Prospectus also failed to disclose that by the time of its IPO, BMJ lacked a sufficient management infrastructure to adequately manage the physician practices it had already acquired and was contractually bound to manage, and its inability to acquire, integrate and effectively manage additional practices thereafter.

7.    On December 17, 1998 -- some 10 months following its IPO -- BMJ commenced bankruptcy proceedings under Chapter 11 of the U. S. Bankruptcy Code.

8.    In a press release issued the day of its bankruptcy filing, the truth began to emerge.  At that time, BMJ issued a press release that stated "[p]rior to the petition date, four medical groups filed lawsuits against the Company seeking damages and rescission of their Management Services Agreements on account of alleged breach of contract, fraud and securities fraud."

9.    BMJ's stock, which had briefly traded as high as approximately $8.40 per share subsequent to the IPO, closed at approximately $0.08 per share on December 31, 1998.

10.    On January 4, 1999, the *Wall Street Journal* cited BMJ as the "worst perform[ing]" IPO of 1998, having lost 98.9% of its value.  As a result of defendants' wrongful conduct, plaintiffs and the members of the Class have been damaged.

## JURISDICTION AND VENUE

11.    This action arises under sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.

12.   This Court has jurisdiction over the subject matter of this action pursuant to section 22 of the Securities Act, 15 U.S.C. § 77v, and pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

13.   Venue is proper in the District pursuant to section 22 of the Securities Act, 15 U.S.C. § 77v.  At all times relevant, BMJ maintained its corporate headquarters in this District, and the acts alleged herein, including the preparation and dissemination of materially false and misleading information, occurred at least in substantial part in this District.

14.   In connection with the acts alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

**PARTIES**

15.   (a) Plaintiff Brenda Sapir, as set forth in the accompanying certification, purchased shares of BMJ common stock pursuant or traceable to BMJ's IPO prior to December 17, 1998 and has been damaged thereby.

(b) Plaintiff Lori Weakland, as set forth in the accompanying certification, purchased shares of BMJ common stock pursuant or traceable to BMJ's IPO prior to December 17, 1998 and has been damaged thereby.

(c) Plaintiff Jo Ann Bruns, as set forth in the accompanying certification, purchased shares of BMJ common stock pursuant or traceable to BMJ's IPO prior to December 17, 1998 and has been damaged thereby.

16.   Defendants Delphi Ventures, Delphi BioInvestments III, L.P. and Delphi Ventures III, L.P. (collectively, "Delphi") are funds or affiliates of a private venture capital firm located at 3000 Sand Hill Road, Building One, Suite 135, Menlo Park, California, 94025.  Defendant Delphi beneficially owned 132,540 shares of BMJ's common stock prior to the IPO, and owned rights to more than an additional 467,778 such shares pursuant to certain convertible securities

and warrants it held.   Defendant Delphi owned 1,295,650, or 8.00%, of BMJ's common stock upon consummation of the IPO.

17.   Defendants Oak Investment Partners VI, L.P. and Oak IV Affiliates Fund, L.P. (collectively, "Oak Partners") are funds or affiliates of a private venture capital firm located at One Gorham Island, Westport, Connecticut, 06880. Defendant Oak Partners beneficially owned 132,540 shares of BMJ's common stock prior to the IPO, and owned rights to more than an additional 465,342 shares pursuant to certain convertible securities and warrants it held. Defendant Oak Partners owned 1,295,650, or 8.00%, of BMJ's common stock upon consummation of the IPO.

18.   Defendant Donald J. Lothrop ("Lothrop") was, at all times relevant, a Director of BMJ and a general partner of Delphi Ventures.  Upon information and belief, Delphi Ventures is an affiliate of defendants Delphi Ventures III, L.P. and Delphi BioInvestments III, L.P.  At all times relevant, Lothrop served on the Audit Committee of BMJ's Board and, through his attorney-in-fact, signed BMJ's Prospectus.  In addition, on October 7, 1998, Lothrop succeeded Naresh Nagpal, M.D. ("Nagpal") as President and Chief Executive Officer of BMJ and served in those capacities until December 17, 1998, when BMJ filed for bankruptcy.  Through Delphi, defendant Lothrop beneficially owned 132,540 shares of BMJ's common stock prior to the IPO, in addition to rights to more than 467,778 additional shares of common stock pursuant to certain convertible securities and warrants held by Delphi.  Through Delphi, Lothrop beneficially owned 1,295,650, or 8.00%, of BMJ's common stock upon consummation of the IPO.  In such capacities, Lothrop had access to the adverse, nonpublic material information concerning BMJ's accounting and management practices, business prospects and capital structure as alleged herein.

19.   Defendant Ann Lamont ("Lamont") was, at all times relevant, a Director of BMJ and a managing member of the general partner of defendant Oak Partners and related entities.  At all times relevant, Lamont served on the Compensation Committee of BMJ's Board and, through her attorney-in-fact, signed BMJ's Prospectus.    Through Oak Partners, defendant Lamont beneficially owned 132,540 shares of BMJ's common stock, plus rights to more than 465,342

additional shares of common stock pursuant to certain convertible securities and warrants held by Oak Partners.   Defendant Lamont, through Oak Partners, beneficially owned 1,295,650, or 8.00%, of BMJ's common stock upon consummation of the IPO.  In such capacities, Lamont had access to the adverse, nonpublic material information concerning BMJ's accounting and management practices, business prospects and capital structure as alleged herein.

20.   Defendant Nagpal founded BMJ in January 1996.  Nagpal was, at all times relevant, a member of and Chairman of BMJ's Board of Directors, Chief Executive Officer and President. In such capacities, Nagpal had access to the adverse, non-public material information concerning BMJ's accounting and management practices, business prospects and capital structure as alleged herein.  Nagpal beneficially owned 846,825 shares, or 9.06%, of BMJ's common stock, prior to the IPO, and held rights to obtain an additional 476,200 shares of common stock pursuant to certain convertible securities and warrants he held.   Nagpal beneficially owned 1,752,940 shares, or 10.73%, of BMJ's common stock upon consummation of the IPO.  Further, defendant Nagpal signed BMJ's Prospectus.

21.   Defendant David H. Fater ("Fater") was, at all times relevant, BMJ's Executive Vice President, Chief Financial Officer, and a member of its Board of Directors.  In such capacities, Fater had access to the adverse nonpublic material information concerning BMJ's accounting and management practices, business prospects and capital structure as alleged herein.  Fater signed BMJ's Prospectus individually, and as attorney-in-fact on behalf of defendants Lamont and Lothrop.    Earlier in his career, Fater had been a partner in defendant Ernst & Young, LLP.

22.   Defendant Hambrecht & Quist LLC ("Hambrecht") is headquartered at One Bush Street, San Francisco, California 94104.  On September 9, 1997, Hambrecht, through its affiliates Health Care Services-BMJ, LLC and H&Q Services Ventures, L.P., purchased $2.5 million of $4.0 million aggregate principal amount of BMJ's 6.00% subordinated convertible debentures due August 31, 2000; the remaining $1.5 million of said debentures were purchased by defendants Nagpal, Oak Partners, Delphi and their affiliates.  As a consequence, defendants Hambrecht, Nagpal, Oak Partners and Delphi had a direct or indirect interest in ensuring that

BMJ's IPO be consummated despite the materially misleading statements and omissions in the Prospectus.

23.   Defendant Raymond James & Associates, Inc. ("Raymond James") is headquartered at 880 Carillon Parkway, St. Petersburg, Florida 33716, and also has an office in this District at 515 North Flagler Drive, West Palm Beach, Florida 33401.

24.   Defendant Volpe Brown Whelan & Company ("Volpe Brown") is headquartered at One Maritime Plaza Suite 1100, San Francisco, California 94111.

25.   Hambrecht, Raymond James and Volpe Brown (collectively, the "Underwriter Defendants") are investment banking firms who served as the lead underwriters for BMJ's IPO. The IPO was sold on a "firm commitment" basis pursuant to which the Underwriter Defendants were obligated to purchase all shares of BMJ's common stock if any such shares were offered.  In addition to certain other fees, costs and expenses, the Underwriter Defendants received as compensation a discount of $0.49 per share, for a total of $2,254,000.

26.   Defendant Ernst & Young LLP ("E&Y") is an independent public accounting and auditing firm headquartered at 787 Seventh Avenue, New York, New York  10019.  E&Y was engaged by BMJ to provide accounting, auditing and related services, and acted in such capacities at all times relevant. Among other things, E&Y gave BMJ accounting advice and consultation regarding BMJ's financial statements and selected financial data, including without limitation as to how those financial statements were presented in the Prospectus.  E&Y consented to the inclusion in the Prospectus of its unqualified opinions on BMJ's financial statements for the periods ending December 31, 1996 and September 30, 1997.   In such capacities, E&Y had a duty under Generally Accepted Auditing Standards ("GAAS") to read the entire Prospectus. E&Y participated in and/or approved of BMJ's misleading accounting practices as alleged herein. In particular, E&Y either knew or should have known that, but for its participation in, and/or approval of, BMJ's misleading accounting practices, the Company's IPO could have never been brought to the market, at least at the price and in the aggregate amount BMJ actually did.

27.  BMJ is a Delaware corporation with its principal place of business at 4800 North Federal Highway, Suite 101E, Boca Raton, Florida, 33431.  As a result of its bankruptcy filing, BMJ is not named as a defendant herein.

## CONTROLLING PERSONS

28.  Defendants Delphi, Oak Partners, Lothrop, Lamont, Nagpal and Fater (the "Controlling Person Defendants"), by reason of their executive and/or board positions or stock ownership, were controlling persons of BMJ at all times relevant, and had the power and influence, and exercised same, to cause BMJ to engage in the misconduct alleged herein.

29.  Controlling Person Defendants Nagpal, Fater, Lamont and Lothrop occupied executive and/or board positions that made them privy to non-public information concerning BMJ.  Because of this access, each of these defendants in fact did not believe, or failed to exercise due diligence and/or to take reasonable steps to ensure, that the Prospectus was free of material misstatements and omissions.  At all times relevant, Controlling Person Defendants Oak Partners and Delphi III were controlled by defendants Lamont and Lothrop, respectively, and by virtue of their BMJ stock ownership, were controlling persons of BMJ.  Each of the Controlling Person Defendants is liable for making, participating in and/or approving the false and misleading statements in the Prospectus which damaged purchasers of BMJ common stock in violation of the federal securities laws.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

30.  Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all persons and entities who purchased or otherwise acquired at any time prior to December 17, 1998, the common stock of BMJ pursuant or traceable to BMJ's IPO.  Excluded from the Class are the defendants named herein, the officers and directors of BMJ, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any defendant has or had a controlling interest.

31. Because 4,600,000 shares of BMJ common stock were issued and outstanding as a result of BMJ's IPO, the members of the Class are so numerous that joinder is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are at least hundreds of members of the Class and that they are geographically dispersed.

32. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law alleged herein.

33. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

34. Common questions of law and fact exist as to all members of the Class and are predominant over any questions solely affecting individual members. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) Whether defendants pursued, participated in and/or approved the common course of conduct alleged herein;

(c) Whether the defendants failed to exercise due diligence and/or to take reasonable steps to ensure that the Prospectus was free from material misrepresentations and omissions;

(d) Whether the Prospectus contained misstatements of material fact and omitted to disclose material facts necessary to make the statements made not misleading; and

(e) The extent to which the members of the Class have sustained damages and the proper measure of damages.

35. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by the individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  Plaintiffs anticipate no difficulty in the management of this Class action that will preclude its maintenance as a class action.

## FACTS

36.  BMJ was founded by Nagpal in January 1996 as a physician practice management ("PPM") firm.  As such, BMJ claims in its Prospectus that it provides management services to physician practices specializing in musculoskeletal and orthopaedic care, and related services.

37.  By the time of its February 4, 1998 IPO, BMJ had  acquired 25 physician practices comprising 117 doctors practicing in Arizona, California, Florida, Pennsylvania, New Jersey and Texas.  Because of federal and state regulations and other factors, such as state law prohibitions on fee-splitting earned by physicians, BMJ's strategy was to enter into a series of contracts (the "Affiliation Agreements"), which included management service agreements (the "MSAs"), pursuant to which it would acquire physician practices.

38.  In general, the MSAs contractually obligate BMJ to provide management, administrative and business development services to the physician practices, while the physicians retained sole responsibility for the practice of medicine.  Typically, the MSA's were entered into by BMJ and the affiliated practices for a 40 year term.

39.  BMJ's revenues under the MSAs are typically based on a specified percentage of the physician practice group's revenue, usually between 10-15%, with an average fee of approximately 12.5%.   In addition, the MSAs provide that BMJ is entitled to approximately two-thirds of any cost savings the practices realize through BMJ's increased purchasing power for such things as malpractice and other insurance, group benefits and medical supplies.  BMJ would also receive a percentage of any profit generated by ancillary services it was to develop for the physician practices.  (These revenues  allegedly earned by BMJ under the MSA's, which are the only revenues to which BMJ was entitled under the MSAs, are sometimes referred to herein as the "Percentage Management Fees.").  The Prospectus also reports that BMJ receives revenue from non-physician affiliated expenses.

40.   In consideration for entering into the Affiliation Agreements, the physician practices received BMJ stock, cash and promissory notes, typically a combination of the three. The cash and notes portions of the consideration were usually paid to the affiliated practices on an installment basis, although the practices would also receive portions of the payments at the time the Affiliation Agreements closed.

### BMJ'S February 1998 IPO

41.   BMJ originally planned to raise an aggregate of $50-60 million in gross proceeds through an initial offering of its stock at a minimum price of $10 per share. BMJ believed that this amount was necessary to sufficiently capitalize its business, reduce debt, adequately manage its existing practices, develop ancillary services and acquire new practices. BMJ also believed that a price of $10 per share was the minimum to assure both a successful public offering and a viable or successful secondary trading market.

42.   BMJ was unable to realize $10 per share in the IPO. In fact, shortly before the IPO, BMJ effected a 5-for-7 reverse stock split, and even then was only able to sell its shares in the IPO at $7 per share. This was in reality a reduction in the originally planned minimum price ($10.00) of approximately 50%; a pre-split share would equate to a post-split share of .71 shares, which, when valued, at $7.00, became $5.00. Consequently, the combination of the reverse split and the $7.00 price resulted in a dramatic decrease in the proceeds of the offering from approximately $60 million to, on a net basis, less than $29 million. The reduced proceeds were so inadequate that the defendants knew, or should have known, but failed to disclose, that BMJ should have abandoned the IPO. Nevertheless, with the participation of each of the defendants, BMJ elected to proceed with the IPO at the significantly reduced price and number of shares, and thus significantly reduced total proceeds.

43.   On February 4, 1998, BMJ's IPO was brought to the market. The IPO consisted of 4,000,000 shares of BMJ common stock priced at $7.00 per share, for $28,000,000 in gross proceeds. Subsequently, on March 9, 1998, the Underwriter Defendants exercised their over-allotment option and BMJ sold an additional 600,000 shares, raising an additional $4,200,000.

Accordingly, and after deducting the underwriting discount of $0.49 per share and related expenses, BMJ raised total net proceeds of approximately $28.3 million through its IPO.

44.   The Prospectus noted that BMJ would use the net IPO proceeds to satisfy certain of its outstanding debt obligations in the approximate amount of $24.3 million, and the remaining net proceeds for general corporate purposes.   Among the Company's significant creditors at the time of its IPO were defendants Oak Partners, Delphi, Hambrecht and Nagpal.

### Additional False and Misleading Statements and Omissions Of Material Fact

45.   The Prospectus contained numerous false and misleading statements and failed to disclose material facts necessary to make the statements made not misleading.   Each defendant made, participated in making, acquiesced in and/or approved these material misstatements and omissions, and either did not believe, or had no reasonable grounds to believe, that the Prospectus was free from material misstatement and omission.

46.   The Prospectus contained materially inaccurate and misleading financial statements and disclosure of the financial condition of BMJ, and omitted to state the true, and much worse, financial condition of the Company.   The Prospectus which was dated February 4, 1998, showed that BMJ had lost $8,860,000 through the first nine months of 1997, which ended September 30, 1997.   As of February 4, 1998, the fiscal year ending December 31, 1997 was clearly over. However, the financial statements in the Prospectus, with the participation or approval of defendant E&Y, were misleading because BMJ subsequently disclosed that its actual 1997 year end losses totaled $31,573,000.   In other words, BMJ's loss for the last three months of 1997 was over 350% higher than its loss for the first nine months of 1997.   This huge additional loss, which had already been incurred as of the date of the Prospectus, rendered BMJ's Prospectus highly misleading.

47.   The Prospectus failed to disclose the true circumstances surrounding BMJ's 5-for-7 reverse stock split.   In particular, with respect to the reverse stock split, the Prospectus misleadingly stated only as follows:

> Unless otherwise indicated, all information in this Prospectus (i) gives effect to a 5-for-7 reverse stock split of the Company's Common Stock to be effected immediately prior to the consummation of the Offering and (ii) assumes no exercise of the Underwriters' over-allotment option.

48.    This statement regarding BMJ's reverse stock split was materially misleading.  At the direction and/or with the approval of each of the defendants, BMJ omitted to disclose that but for the reverse stock split, the Company would not have been able to bring its IPO to market. Further, the defendants knew or should have known, but failed to disclose, that the reverse split was undertaken to ensure that the IPO would be consummated at all costs.  In addition, the defendants knew or should have known that even with the reverse split and its IPO, the amounts BMJ raised were woefully insufficient to adequately capitalize its business, particularly given its chronic indebtedness and continuing substantial losses.

49.    In addition, the foregoing statement regarding BMJ's stock split was materially misleading because the Prospectus failed to disclose that defendants Oak Partners, Lothrop, Delphi, Lamont and Nagpal had a direct interest in ensuring that the BMJ IPO go to market at all costs.  Specifically, defendants Oak Partners, Lothrop, Delphi, Lamont and Nagpal all owned convertible securities whose conversion depended upon the successful completion of the IPO. These defendants stood to acquire at least 2,000,000 additional shares of BMJ common stock at prices extremely favorable to them and far less than public investors were offered, upon completion of the IPO.   Without the reverse stock-split, however, and ensuing increase of the per-share price, the IPO would have been impossible and these defendants' conversion rights would be lost.

50.    The Prospectus failed to disclose that BMJ's actual net IPO proceeds of approximately $28.3 million were far short of the amounts BMJ believed were necessary to satisfy its debt and fund and execute its operations consistent with its business strategy.  Further,

**allocation of consideration to affiliations or the
amortization life assigned to intangible assets.**

(Emphasis added)

53.  The foregoing statements were materially false and misleading.  In particular, far from "currently evaluating the impact that this" accounting practice "may have" on its "affiliation strategy", the defendants knew or should have known, but failed to disclose, that by recognizing this phantom revenue, BMJ's size was vastly overstated for purposes of the IPO. In fact, although it did not alter BMJ's reported results of operations, the defendants knew or disregarded and failed to disclose that without this accounting gimmick, BMJ's IPO could never have been brought to market.  Had BMJ recognized as revenue only its agreed-to Percentage Management Fees under the MSAs, its losses as a percentage of revenue would have increased dramatically, and its gross revenue would have plummeted.  Defendant E&Y nevertheless blessed these accounting presentations, including BMJ's revenue recognition practices, for purposes of the IPO.

54.  Aside from its interest in cost savings and ancillary services, BMJ's interest in the physician practice revenues was limited to its Percentage Management Fees from such revenues, the rest being merely a pass through back to the physician practices and their suppliers.  With the knowledge, participation or approval of each of the defendants, BMJ compounded this financial mirage by defining "Management Fee Revenue" in the Prospectus in a way that was not based on the actual management fees to which it was entitled as provided in the MSAs. The defined term "Management Fee Revenue" in the Prospectus included over one-half of BMJ's affiliated practices' combined gross revenues, despite the fact that BMJ was not entitled under the MSAs to retain any of these revenues except the Percentage Management Fees.  Instead, these gross revenues were merely funneled through BMJ.  BMJ had no real interest in these funds, but was merely a conduit, obligated to pass through are portions of these funds other than the Percentage Management Fees to its affiliated practices.

55. Similarly, the Prospectus also falsely portrayed BMJ's ability to acquire additional physician practices that was so integral to its business strategy. For example, in the so-called "risk factor" disclosures, the Prospectus misleadingly stated as follows:

> Risks Related to New Affiliations and Expansion.
> **The Company is exposed to significant growth-related risks because an essential element of its strategy is to affiliate with and/or to merge affiliated musculoskeletal practices and to expand the business of such practices.** The Company's strategy also involves assisting the practices in recruiting physicians, expansion and development of the IPA and, to the extent permitted by applicable law, contracting with or establishing ancillary musculoskeletal facilities (the ancillary service facilities'), such as ambulatory surgery, physical therapy and magnetic resonance imaging ('MRI') centers and mobile units, and contracting with associated providers. Identifying appropriate physician group practices, individual physicians and ancillary providers and facilities, and proposing, negotiating and implementing economically attractive affiliations with such practices, physicians and providers, as well as merging such practices, can be a lengthy, complex and costly process. **The failure of the Company to affiliate with additional musculoskeletal practices or merge practices would have a material adverse affect on the Company's ability to execute its expansion strategy. Moreover, future affiliations or mergers, if any, may not contribute to the Company's profitability or otherwise facilitate the successful implementation of the company's overall strategy.**

(Emphasis added)

56. The foregoing statements were materially false and misleading. In truth, prior to, during and from the outset of BMJ's IPO, the defendants knew or should have known, but failed to disclose, that the Company was chronically undercapitalized, lacked sufficient cash and had an inadequate management infrastructure. As a consequence, at the time of BMJ's IPO, the

defendants either did not believe, or had no reasonable basis to believe, that the Company could successfully acquire, integrate and manage additional physician practices.

57.   The foregoing statements were also materially false and misleading because at the time these statements were made, the defendants did not believe, and/or had no reasonable basis to believe, that BMJ was successfully integrating and managing its existing affiliated practices, much less expanding these practices or successfully acquiring additional practices.   In short, although the Company disclosed that its failure to acquire additional practices "would have a material adverse affect on the Company's ability to execute its expansion strategy", that statement was highly misleading because the defendants either did not believe, or had no reasonable basis to believe, that BMJ's expansion strategy could succeed, particularly in light of BMJ's financial condition and insufficient management infrastructure.

58.   The Prospectus was also materially misleading because it failed to disclose that BMJ was failing to perform, and was therefore in material breach of, a material number of its MSAs. As examples of these defaults, the defendants knew or should have known at the time of the BMJ's IPO that:

      (a)   BMJ did not have the expertise or capability to negotiate favorable contracts for affiliated physician groups with third party payors.

      (b)   BMJ did not have the capability or expertise to develop profitable ancillary services for affiliated physician groups.

      (c)   BMJ did not have the capability or expertise to improve the financial performance of affiliated physician groups.

      (d)   BMJ did not have adequate working capital and liquidity to fulfill its obligations to affiliated physician groups and to effectuate its business strategy, which included expanding the number of affiliated physician groups and expanding ancillary services, while fulfilling its contractual obligations to the affiliated physician groups under their respective MSAs.

17

(e)    BMJ was not developing and had no capability to develop valuable information technology for the affiliated physician groups.

(f)    BMJ did not have any meaningful financial information expertise to provide to affiliated physician groups.

59.    The Prospectus likewise contained the following untrue statements of material facts with respect to BMJ's management services under the MSAs:

> Dependence on the Practices and Physicians. The Company's revenues are dependent on its affiliation through Management Services Agreements with the Practices and on the success of the Practices, including the IPA. There can be no assurance that the Practices will maintain successful operations, that they will not terminate their Management Services Agreements or that key physicians in a particular Practice will continue to affiliate with such Practice. On a pro forma basis for the year ended December 31, 1996 and the nine months ended September 30, 1997, the Company received approximately 19% and 21%, respectively, of its total revenue from management fees paid by the Southern California Orthopaedic Institute Medical Group ('SCOI'). The termination of the SCOI Management Services Agreement would have a material adverse effect on the Company.

60.    In addition, the Prospectus also misleadingly stated as follows with respect to BMJ's management services under the MSAs:

> [T]he Company has the primary responsibility for the business and administrative aspects of the Practices. Pursuant to the Management Services Agreements, the Company provides or arranges for various management, administrative and development services relating to the day-to-day non-medical operations of the Practices. Pursuant to the Management Services Agreements, the Company acts as the exclusive manager and administrator of non-medical services relating to the operation of the Practices.

61.   The foregoing statements were materially misleading.  In fact, the Prospectus failed to disclose that BMJ's corporate infrastructure could not support the management of its affiliated practices the Company had already acquired by the time of the IPO.   Nor did the Prospectus disclose that BMJ had insufficient staffing to provide the requisite management services under the MSAs.   Instead of providing these services, a significant number of its already thin corporate staff at its Boca Raton headquarters focused primarily on scouting new practices for future acquisitions, rather than properly managing the existing practices the Company had already acquired and developing ancillary services for those practices.

62.   Further, the Prospectus failed to disclose that BMJ neither did, nor adequately could, deliver even the basic management services required under the MSAs.   In fact, the defendants knew or should have known, but failed to disclose, that BMJ failed to provide its affiliated practices with adequate management services relating to basic information technology, accounting, billings and collections, personnel, and negotiations with third party payors, among other things, all of which were vital to the success of these physician practices.

63.   Defendant E & Y audited the financial statements of BMJ as of December 31, 1996 and September 30, 1997 that were included in the Prospectus.   The date of the E & Y audit opinion in the Prospectus was November 11, 1997, with one exception as of December 23, 1997. In connection with its audit work for BMJ, E & Y was required under generally accepted accounting principles ("GAAP") and generally accepted auditing standards ("GAAS") to review and disclose subsequent events, that is, those events occurring after the date of the audit opinion through the date of the effectiveness of the Prospectus, which in this case was February 4, 1998. Disclosure of losses occurring after September 30, 1997, for example, would be required if these disclosures were necessary in order to make the audited financial statements not misleading. Where changes in corporate operations have a material effect on earnings (or losses) occurring after the date of the audited financial statements, the omission to disclose those changes and their effect on the financial statements is misleading.   The BMJ audited financial statements were deficient for failing to disclose that BMJ had operated at a materially increased loss between the

date of the latest audited financial statements and the date of the Prospectus. It was materially misleading not to disclose the large operating losses occurring after September 30, 1997 and prior to the time that the Prospectus became effective on February 4, 1998. Under GAAS, auditors whose opinions are included in a Prospectus have a duty to extend their inquiries from the date of the last audited financial statements through the effective date or as close thereto as is reasonable and practicable in the circumstances. The auditor is required to arrange with its client to be kept advised of the progress of the registration statement so that a review of subsequent events can be completed by the effective date. Among other things, at or near the effective date, E & Y must read the entire Prospectus and make inquiries of officers and others as to events that have occurred after the date of the audited financial statements to determine whether matters have occurred that should be disclosed in order to keep those statements from being misleading. Therefore, as of February 4, 1998, E & Y knew or should have known of the extent of BMJ's loss as of December 31, 1997. E & Y failed to comply with these provisions GAAP and GAAS by failing to require disclosure of the year-end loss in the Prospectus, and/or withdrawing its opinion on the audited financials in the Prospectus.

## The Truth Begins To Be Revealed

64. In its Form 10-K covering the transition period from January 1, 1998 to March 31, 1998, BMJ reported a 1997 year-end loss of $4.97 per share, or $31,573,000 in total. Again, defendant E&Y gave unqualified opinions on BMJ's financial statements included in the 10-K for the periods ending December 31, 1996, December 31, 1997 and March 31, 1998.

65. On June 30, 1998, BMJ issued a press release reporting that it had arranged a $60 million credit facility managed by Paribas, S.A. on behalf of a syndicate of banks. In the press release, Nagpal continued to mislead public investors by touting BMJ's prospects, stating that the credit facility "will strengthen our capital base and enhance our ability to execute our growth strategy of building market share and adding value to our affiliated physicians through the introduction of ancillary services."

66.   On July 30, 1998, BMJ reported that it had a net quarterly loss, after inclusion of extraordinary charges of $3,038,000 ($0.15 per share), of $2,744,000 ($0.14 per share) for the quarter ending June 30, 1998.  BMJ's 10-Q filed with the SEC on August 14, 1998 reported that the Company's cash had dwindled from over $9.5 million as of March 31, 1998, to just over $3.6 million as of June 30, 1998, while over the same period debt doubled from approximately $18.1 million, to approximately $36.7 million.

67.   On September 24, 1998, BMJ issued a press release announcing "a major restructuring plan designed to lower corporate overhead costs while providing additional regional support to its affiliated physicians and practices."  As part of its restructuring plan, BMJ terminated 20 employees in operations, development and finance, resulting in charges of approximately $2 million for the quarter ending September 30, 1998.  At that time, Nagpal again continued to mislead public investors, stating that "our near-term efforts will be devoted entirely to adding value to our existing practices . . . ."

68.   On October 7, 1998, BMJ announced that effective immediately, Lothrop had been elected to serve as BMJ's President and Chief Executive Officer, succeeding Nagpal.  Nagpal, however, remained Chairman of BMJ's Board of Directors.

69.   On November 16, 1998, BMJ reported a six-month loss ending September 30, 1998, of $5,054,000, or $0.29 per share.  At that time, BMJ also reported a net quarterly loss, for the three month period ending September 30, 1998, of $2,310,000, or $0.14 per share.

70.   On  November 17, 1998, BMJ-affiliate Southern California Orthopedic Institute ("SCOI") notified BMJ that it was in material default of its obligations under SCOI's MSA.  In its default notice, SCOI reported that BMJ had failed to provide the personnel, billing, collections and information systems contracted for.   Significantly, and according to the Prospectus, SCOI, the largest affiliated groups, constituted 19-21% of BMJ's gross revenues.  SCOI's MSA provided a 30 day period to cure defaults.

71.   On December 11, 1998, BMJ affiliate Fishman & Stashak, M.D.'s P.A. d/b/a Gold Coast Orthopedics ("GCO"), commenced a lawsuit in Palm Beach County against BMJ

captioned <u>Fishman & Stashak, M.D.'s P.A., v. BMJ Medical Management, Inc</u>., 98-11097 AI (Cir. Ct. Palm Beach County, Fla.).   The Complaint charges BMJ with fraud, breach of contract and securities fraud, and seeks damages and rescission of the MSAs BMJ had with these practice groups.   In general, GCO's complaint alleged that BMJ failed to meet its obligations under its MSA to provide accounting, management, billings, collections, and information systems.

72.   On December 11, 1998, BMJ affiliate Lighthouse Orthopaedic Associates ("LOA") and an affiliated orthopedic group, Orthopaedic Surgery Associates ("OSA"), commenced a lawsuit in Palm Beach County against BMJ and Nagpal captioned <u>Lighthouse Orthopedic Associates, Inc. and Orthopedic Surgery Associates, Inc. v. BMJ Medical Management, Inc. and Naresh Nagpal, M.D</u>., 98-11059 AH (Cir. Ct. Palm Beach County, Fla.).   The Complaint charges BMJ and Nagpal with fraud, breach of contract and securities fraud, and seeks damages and rescission of the MSAs BMJ had with these practice groups.   In general, LOA and OSA's complaint alleged that BMJ failed to meet its obligations under its MSA to provide accounting, management, billings, collections, and information systems.

73.   On December 17, 1998, exactly 30 days after SCOI's default letter, and being unable to cure the defaults specified therein and in the complaints filed by GCO, LOA and OSA, BMJ and five of its subsidiaries commenced bankruptcy proceedings.

74.   In a January 4, 1999 article, the *Wall Street Journal* reported that BMJ's IPO was "the worst perform[ing]" IPO of 1998, losing 98.9% of its value.   BMJ stock, which had traded as high as $8.40 per share in March 1998, closed at $0.08 on December 31, 1998.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

75.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements alleged herein because section 27A(a)(2)(d) of the Securities Act explicitly excludes from the safe harbor any statements "made in connection with an initial public offering."

## COUNT I
## AGAINST ALL DEFENDANTS FOR VIOLATIONS OF
## SECTION 11 OF THE SECURITIES ACT

76.   Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth herein.

77.   This Count is brought against each of the defendants on behalf of all Class members who purchased BMJ common stock pursuant or traceable to BMJ's IPO.

78.   The Prospectus, at the time and as it was filed with the SEC on or about February 4, 1998, contained untrue statements of material facts and omitted from disclosure material facts necessary to make the statements made therein not misleading, as set forth herein.   Each defendant did not believe, and/or failed to exercise reasonable diligence or had no reasonable grounds to believe, that the Prospectus was free of material misstatement and omission.

79.   Plaintiffs and members of the Class acquired BMJ common stock issued pursuant or traceable to the false and misleading Prospectus.

80.   Plaintiffs and members of the Class have sustained damages as a result of defendants' wrongdoing alleged herein.   The value of BMJ common stock has declined substantially subsequent to, and because of, the defendants' misconduct.

81.   At the time they purchased BMJ common stock, plaintiffs and the other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.

82.   Less than one year has elapsed from the time that the securities upon which this Count is based were offered to the public.

## COUNT II
### AGAINST DEFENDANTS DELPHI, OAK PARTNERS, LOTHROP, LAMONT, NAGPAL, FATER, HAMBRECHT, RAYMOND JAMES, AND VOLPE BROWN FOR VIOLATIONS OF SECTION 12(a)(2) OF THE SECURITIES ACT

83. Plaintiffs repeat and allege each and every preceding allegations if fully set forth herein.

84. This Count is brought pursuant to section 12(a)(2) of the Securities Act against the Defendants Delphi, Oak Partners, Lothrop, Lamont, Nagpal and Fater, Hambrecht, Raymond James and Volpe Brown.

85. Said defendants were sellers, offerors, and/or underwriters and solicitors of sales of shares of common stock issued by BMJ in its IPO, as set forth herein.

86. The Prospectus contained untrue statements of material facts and omitted to disclose facts necessary to make the statements made, at the time and in the circumstances they were made, not misleading.

87. Said defendants solicited and/or were a substantial factor in the purchase by plaintiffs and the members of the Class of common stock issued by BMJ in its IPO, as set forth herein.

88. But for said defendants' selling and/or solicitation activities as set forth herein, BMJ's February 4, 1998 IPO could and would not have been accomplished.

89. None of the false and misleading statements or omissions in the Prospectus described herein was known to plaintiffs and the members of the Class at the time they acquired BMJ stock.

90. By reason of their misconduct alleged herein, said defendants violated section 12(2) of the Securities Act. As a direct and proximate result of these violations, plaintiffs and the other members of the Class sustained substantial damage in connection with their purchases of BMJ common stock.

91. Plaintiffs and the other members of the Class purchased or otherwise acquired BMJ common stock issued pursuant or traceable to the Prospectus. Plaintiffs did not know, and in the

exercise of reasonable diligence could not have known, of the misstatements and omissions in the Prospectus.

92.   Plaintiffs have sustained damages, as the value of BMJ common stock has declined substantially subsequent to, and because of, the defendants' violations.

93.   Less than one year has elapsed from the time that the securities upon which this Count is based were offered to the public.

94.   To the extent they still own their BMJ shares, plaintiffs and the members of the Class hereby tender such shares back to said defendants.

**COUNT III**
**AGAINST DEFENDANTS NAGPAL, FATER, LAMONT,**
**LOTHROP, OAK PARTNERS AND DELPHI**
**FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT**

95.   Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth herein.

96.   This Count is brought pursuant to section 15 of the Securities Act against Controlling Person Defendants Nagpal, Fater, Lamont, Lothrop, Oak Partners and Delphi.

97.   Said Controlling Person Defendants, by virtue of their positions, acts, and/or BMJ stock ownership as described herein, were, at the time of the wrongdoing alleged herein, controlling persons within the meaning of section 15 of the Securities Act.

98.   By reason of the conduct alleged in Counts I and II herein, said Controlling Person Defendants are liable for their wrongful conduct, and are liable to plaintiffs and the other members of the Class for the damages that members of the Class suffered in connection with their purchases of BMJ common stock.

## COUNT IV
## AGAINST ALL DEFENDANTS
## NEGLIGENT MISREPRESENTATION

99.  Plaintiffs repeat and reallege each and every preceding allegation as if fully set forth herein.

100.  With respect to the information provided to plaintiffs about BMJ, defendants owed plaintiffs a duty of reasonable care. Defendants knew that plaintiffs were relying upon the misrepresentations set forth in the Prospectus about BMJ's performance and financial condition in assessing whether to purchase BMJ stock.

101.  In order to induce plaintiffs to purchase BMJ stock, defendants made the misrepresentations and material omissions specified herein.

102.  In fact, these representations were false in material respects, and defendants knew they were false or would have known they were false had they exercised reasonable care.

103.  Moreover, defendants knew that plaintiffs would rely upon these false representations and omissions in assessing whether to purchase BMJ stock.

104.  Plaintiffs' reliance was reasonable, as plaintiffs had no cause to believe that the Prospectus contained materially false and misleading statements, and omissions of material fact.

105.  As a direct and proximate cause of  defendants' negligent misrepresentations, plaintiffs have been damaged.  Plaintiffs would not have purchased BMJ common stock but for the false statements and omissions of defendants.

## BASIS OF THE ALLEGATIONS

106.  Plaintiffs have made the foregoing allegations, other than those concerning themselves, based upon the investigation of plaintiffs' counsel.  Said investigation included a review of BMJ's SEC filings, securities analysts' reports and advisories about the Company, press releases issued by the Company, media reports about the Company, publicly disseminated documents concerning BMJ's business practices, litigation related to certain of the acts and practices as set forth herein, and BMJ's bankruptcy proceedings.  It is believed that substantial

additional evidentiary support will exist for the allegations set forth herein after plaintiffs are afforded a reasonable opportunity for discovery.

WHEREFORE, plaintiffs pray for relief and judgment as follows:

(a)      Determining that this action is a proper class action, certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and their counsel as Class counsel;

(b)      Awarding compensatory and other damages and relief in favor of plaintiffs and other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding plaintiffs and the members of the Class the reasonable costs and expenses incurred in this action, including counsel and expert fees; and

(d)      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  February 2, 1999

Of Counsel:

**BERGER & MONTAGUE, P.C.**
David Berger
Daniel Berger
Lawrence J. Lederer
1622 Locust Street
Philadelphia, PA  19103
(215) 875-3000

**BEASLEY, LEACOCK & HAUSER, P.A.**

By: _____
James W. Beasley, Jr.
David Leacock
Robert J. Hauser
Flagler Center, Suite 1400
505 S. Flagler Drive
West Palm Beach, FL  33401
(561) 835-0900

Attorneys for the Plaintiffs

F:\docs\71383.002\Pleadings\031 - IPO class complaint.doc

(12/96)

# CIVIL COVER SHEET

99-8086

S–44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required , except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use Clerk of Court for the purpose of initiating the civil docket sheet (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM )

| PLAINTIFFS | DEFENDANTS |
|---|---|
| BRENDA SAPIR, LORI WEAKLAND, JO ANN BRUNS, On Behalf of Themselves and All Others Similarly Situated | DELPHI VENTURES, DELPHI BIOINVESTMENTS III, L.P DELPHI VENTURES III, L.P., OAK INVESTMENT PARTNERS VI, L.P., OAK VI AFFILIATES FUND, L.P., DONALD J. LOTHROP, ANN H. LAMONT, NARESH NAGPAL, M.D., DAVID H. FATER, HAMBRECHT & QUIST LLC, RAYMOND JAMES & ASSOCATES, INC., VOLPE BROWN WHELAN & COMPANY, LLC, AND ERNST & YOUNG, LLP. |

COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U S PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT San Mateo
(IN U S PLAINTIFF CASES ONLY) CA

NOTE   IN LAND CONDEMNATION CASES  USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**CIV-ZLOCH**

ATTORNEYS (FIRM NAME ADDRESS AND TELEPHONE NUMBER)

See Attached

ATTORNEYS (IF KNOWN)

**MAGISTRATE JUDGE SELTZER**

RCLE COUNTY WHERE ACTION AROSE:  DADE,  MONROE,  BROWARD,  PALM BEACH,  MARTIN,  ST. LUCIE,  INDIAN RIVER,  OKEECHOBEE HIGHLANDS

## ASIS OF JURISDICTION  (PLACE AN "X" IN ONE BOX ONLY)

J.S. Government Plaintiff

☒ 3 Federal Question
(U.S. Government Not a Party)

J.S. Government Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only) AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

riginal roceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## ATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med Malpractice | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| Miller Act | ☐ 315 Airplane Product Liability | | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| Negotiable Instrument | | ☐ 365 Personal Injury Product Liability | | **A PROPERTY RIGHTS** | B☐ 450 Commerce/ICC Rates/etc |
| Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 460 Deportation |
| Medicare Act | ☐ 330 Federal Employers Liability | | B☐ 640 R R & Truck | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 340 Marine | **PERSONAL PROPERTY** | B☐ 650 Airline Regs | ☐ 840 Trademark | ☐ 810 Selective Service |
| Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | B☐ 660 Occupational Safety/Health | | ☒ 850 Securities/Commodities/ Exchange |
| Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | B☐ 690 Other | **B SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **A LABOR** | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B☐ 530 General | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | A☐ 870 Taxes (U S Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| All Other Real Property | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | ☐ 791 Empl Ret Inc Security Act | A☐ 871 IRS – Third Party 26 USC 7609 | A☐ 890 Other Statutory Actions |
| | | B☐ 550 Civil Rights | | | A OR B |
| | | B☐ 555 Prison Condition | | | |

## CAUSE OF ACTION   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Securities Act of 1933 - Securities Fraud

TH OF TRIAL
days estimated (for both sides to try entire case)

| REQUESTED IN COMPLAINT: | CHECK IF THIS IS A **CLASS ACTION** ☐ UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint: JURY DEMAND: ☒ YES ☐ NO |
|---|---|---|---|

RELATED CASE(S) (See instructions)
IF ANY

JUDGE _____ DOCKET NUMBER _____

SIGNATURE OF ATTORNEY OF RECORD

2/2/99

OFFICE USE ONLY

EIPT _205880_ AMOUNT _$150.00_ APPLYING IFP _____ JUDGE _ZLOCH_ MAG. JUDGE _Seltzer_

**Attorneys for Plaintiffs**

**BEASLEY, LEACOCK & HAUSER, P.A.**
James W. Beasley, Jr.
David Leacock
Robert J. Hauser
Flagler Center, Suite 1400
505 S. Flagler Drive
West Palm Beach, FL   33401
(561) 835-0900

**Of Counsel:**

**BERGER & MONTAGUE, P.C.**
David Berger
Daniel Berger
Lawrence J. Lederer
1622 Locust Street
Philadelphia, P.A.  19103
(215) 875-3000